D. R. Tripplehorn v. Commissioner. Eva Tripplehorn v. Commissioner.
Tripplehorn v. Commissioner
Docket Nos. 110407, 110408.
United States Tax Court
1943 Tax Ct. Memo LEXIS 324; 2 T.C.M. (CCH) 8; T.C.M. (RIA) 43212; May 4, 1943
*324 George S. Atkinson, Esq., and W. E. Swenson, C.P.A., 609 Oliver-Eakle Bldg., Amarillo, Tex., for the petitioners. Frank B. Appleman, Esq., for the respondent. HILL Memorandum Opinion HILL, Judge: This is a consolidated proceeding to redetermine deficiences in income tax of each of the named petitioners in the amount of $684.38 for the calendar year 1939. Only one issue is presented, namely, whether petitioners can deduct from their 1939 income "intangible drilling and development costs" incurred in the drilling of two producing oil wells on leased property. Petitioners filed separate income tax returns on a community property basis. The returns for the taxable year were filed with the collector of internal revenue for the second Texas collection district at Dallas. All of the facts were stipulated and are found as stipulated. Such of the facts as are deemed necessary to an understanding and discussion of the issue presented will be set forth. [The Facts] The petitioners, D. R. Tripplehorn and Eva Tripplehorn, were at all times material herein husband and wife domiciled in the State of Texas. All income and all deductions for the calendar year 1939 involved herein constituted *325 their community income and community deductions, respectively. Petitioners have kept their books of account and made their income returns on the basis of cash receipts and disbursements. Petitioner D. R. Tripplehorn was at all times material herein engaged in the oil business in Texas. The petitioners had previously exercised the option where it was available under appropriate circumstances to expense so-called "intangible drilling and development costs" incurred in the drilling of oil wells. In their separate individual income tax returns for the calendar year 1939 each of the petitioners deducted as "development expenses" one-half of a total of $15,162.79 expended during 1939 in drilling wells Nos. 3 and 4 as producers on the L. H. Webb oil and gas lease in Texas. Such total amount was expended for wages, fuel, hauling and similar costs incident to and necessary for the drilling of the designated wells. The L. H. Webb oil and gas lease above mentioned was acquired by W. W. Shadid as lessee from the owners of the lands on January 7, 1938. Shadid assigned a one-third interest in the lease to Thurman Adkins. On October 6, 1938, Shadid and Adkins assigned to petitioner, D. R. Tripplehorn, *326 all of their right, title and interest in and to all the property described in the lease together with all personal property used or obtained in connection therewith "subject to the terms and provisions and conditions as in said lease set forth." The assignment was made "in consideration of the sum of Ten and No/100ths ($10.00) Dollars and other good and valuable considerations." In addition the instrument of assignment contained the following provision: The Grantors reserve for themselves, their heirs and assigns, one-third of seven-eighths (1/3 of 7/8ths) of the oil and gas produced and marketed from said premises delivered free of cost into the pipe lines to which the wells may be connected, until the said grantors shall have received therefrom the sum of Twenty-Five Thousand and No/100ths ($25,000.00) Dollars without interest, two-thirds of which sum shall be paid grantor, W. W. Shadid, and one-third of which sum shall be paid grantor. Thurman Adkins, upon the payment of which all rights and interest in said lease shall pass to grantee. Prior to such assignment Shadid and Adkins had drilled and completed oil well No. 1 on the leased premises in compliance with the provisions *327 of paragraph XI, infra, of the lease agreement. Petitioner D. R. Tripplehorn drilled and completed as a producer well No. 2 on the leased premises between October 6, 1938 and. December 21, 1938, pursuant to the provisions of the lease. In 1939, petitioner, D. R. Tripplehorn, drilled and completed on the leased premises producing wells Nos. 3 and 4 pursuant to the provisions of the lease. It was in the drilling of these two wells that the expenditures claimed as a deduction in this proceeding were incurred. The disallowance of such deduction constitutes the basis of the deficiencies in tax determined by respondent. The lease which was assigned to petitioner, D. R. Tripplehorn, contained in part the following provisions: I. Lessor for and in consideration of the sum of Ten Dollars ($10.00) * * * and of the royalties herein provided and of the agreements of lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling, mining and operating for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines and other structures thereon to produce, *328 save, take care of, treat, store, transport, and own said products. * * * * *
II. Subject to the other provisions herein contained, this lease shall be for a term of five years from this date (called "primary term") and as long thereafter as oil, gas, or other mineral is produced from said land hereunder. (Paragraph III prescribes the royalties to be paid to the lessors.) IV. If prior to discovery of oil or gas on said land Lessees should drill a dry hole or holes thereon, or if after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling or reworking operations within sixty (60) days thereafter. If at the expiration of the primary term oil, gas or other mineral is not being produced on said land, but lessee is then engaged in drilling or re-working operations thereon, this lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other minerals so long thereafter as oil, gas or other mineral is produced from said land. Lessee shall drill such offset wells as may be *329 necessary to protect said property from drainage. V. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by lessee on said land, including the right to draw and remove all casing. * * * VI. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the * * * assigns, but no change or divisions in ownership of the land, rentals or royalties, however accomplished, shall operated to enlarge the obligations or diminish the rights of lessee. No sale or assignment by lessor shall be binding on lessee until lessee shall be furnished with a certified copy of recorded instrument evidencing same. VII. All obligations of lessee hereunder, both express and implied, are to be understood as covenants and not conditions or limitations; and, save as herein expressly provided, the breach of same shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for a cancellation hereof, in whole or in part. VIII. In case of a cancellation or termination of this lease for any cause lessee shall *330 have the right to retain under the terms hereof ten (10) acres of land around each oil or gas well producing, being worked on or drilling hereunder. * * * * *
XI. Notwithstanding any of the terms and provisions hereof it is understood and agreed by the parties hereto that this lease shall terminate and be of no further force and effect unless lessee at some place on said premises above described or as hereinafter stipulated, shall on or before April 7th, 1938, commence the actual drilling of a well for oil or gas and drill the same with reasonable diligence to a depth sufficient to reach and reasonably penetrate the oil producing horizon in that vicinity unless oil be discovered at a lesser depth in commercial quantities, all at the cost and expense of the lessee; and in like manner the drilling of a second well shall be actually commenced before the expiration of a ninety (90) days period, such period commencing upon the completion of the well hereinabove mentioned, it being agreed that said well is to be considered completed when it has been tested by the Railroad Commission, said well to be drilled on said premises above described, and drilled with reasonable diligence in the *331 same manner and to the same depth as stipulated for the first well; and the drilling of another well shall be commenced before the expiration of another ninety (90) days period, and other wells shall be drilled on said premises at the rate of one for each ninety (90) days period thereafter, all to be drilled in the same manner and on the same premises as specified for the first well, the number of wells to be drilled to be determined by the number of wells permitted on such premises by the rules and regulations of the Railroad Commission and the laws of Texas; and the failure to drill any of the said wells shall cause this lease to cease and terminate, and to be of no further force and effect except as to ten (10) acres around each producing well as stipulated in Paragraph 8 hereof. There shall be no personal liability on the part of Lessee for failure to drill any of the said wells, but such failure shall operate to automatically terminate this lease. Provided, however, and it is understood and agreed between the parties hereto, that the drilling of any offset well by the lessee shall be full compliance with the terms and the provisions of this lease under which he is obligated to *332 drill one well each ninety (90) days, and any such offset well drilled shall be and the same is hereby made one of the wells which the lessee is obligated to drill; and it is further provided that in the event that the Lessee shall drill more than one well in any ninety (90) days period during the term of this lease each additional well shall be and the same is hereby made a full and complete compliance for an additional ninety (90) days period; that is to say that in the event the lessee shall drill two wells during the first ninety (90) days, he shall not be obligated to again drill until during the third period of this lease, the number of wells drilled in any one ninety (90) days period being determinative of the number of succeeding ninety (90) days period during which the lessee is not obligated to commence the drilling of another well. And it is further provided that in the event the lessee shall drill to the oil producing horizon and no oil or gas shall be encountered in commercial quantities, and the said well shall be declared a dry hole, such well and the drilling thereof shall be and the same is hereby made a complete fulfillment of the obligations of the lessee for any *333 one ninety (90) days period during the term of this lease. * * * * *
Petitioners by the terms of the assignment of the lease were in the same status with respect to the performance of the terms and conditions of the lease and the rights and interests, if any, acquired and to be acquired in the leased premises as if they were the original lessees. That status is to be determined by interpretation of the lease agreement irrespective of the oil reservation provision in the assignment. Neither such reservation nor any other provision in the assignment of the lease to petitioners imposed obligations or rights upon them in respect to the considerations, terms and conditions of the lease agreement different from those of their assignors or of the original lessee. In that view we will consider the question here presented and hereinafter the words "lessee" or "lessees" are to be understood as being applicable to petitioners unless otherwise indicated. Petitioners claim the right to the deduction herein claimed under section 23 (a) (1) of the Internal Revenue Code and under the exercise of the option granted in Regulations 103, section 19.23 (m)-16 (a) (1) [1], to deduct such expenditures *334 as intangible drilling and development costs. [Opinion] Respondent contends that the provisions of the regulations relied upon by petitioners are not applicable to the facts in this proceeding for the reason that the drilling and completion of the wells in question were a part of the consideration for the acquisition of rights under the lease agreement. The determinative question, therefore, is whether the drilling of the wells in question constituted a part of the consideration whereby petitioners acquired or were to acquire an interest in the leased premises. If the drilling of the oil wells in question was a part of the consideration for *335 the lease, the petitioners can not deduct the cost thereof as business expense or intangible drilling costs but can recover them only through depletion allowances. F. F. Hardesty, 43 B.T.A. 245, affirmed (CCA-5) 127 Fed. (2d) 843; State Consolidated Oil Co., 19 B.T.A. 86, affirmed 66 Fed. (2d) 648, (12 AFTR 1298); United States v. Sentinel Oil Co., 109 Fed. (2d) 854, (24 AFTR 418); Nunn-Stubblefield Oil Co., 31 B.T.A. 180. If, on the other hand, such drilling did not constitute a part of the consideration for the lease, the expenditures in question are deductible as claimed by petitioners. Petitioners urge that the facts in this proceeding do not bring this case within the principle announced in the cases above cited. They contend that they had secured a vested title in the oil property and that the agreement to drill wells was in the nature of a condition subsequent; that the only result of their failure to drill wells would be a divesting of title; and that accordingly *336 they should have the advantage of the option accorded owners of oil properties under the provisions of the regulation above cited. We think the provisions of the lease instrument clearly support the contention of the respondent. The instrument of lease contained a number of paragraphs setting forth certain rights and liabilities of the parties but paragraph XI thereof, hereinabove set out in full, clearly establishes the character of the lease agreement. The provisions of that paragraph clearly show that the execution of the drilling program therein set forth was the primary consideration for the lease. The provisions in other paragraphs of the instrument of lease were to become operative only in the event that the lessees commenced actual drilling of a well on or before April 7, 1938, and that they continued to be operative only so long as lessees continued with the well drilling program in compliance with the provisions of paragraph XI. As each producing well was completed the lessees acquired a vested interest therein limited to the production of such well and an area of 10 acres of land surrounding it, but as to the remainder of the premises embraced in the lease agreement, *337 no rights of the lessees attached except as other producing wells were brought in by them. If, at any time, the lessees should default in carrying out the drilling program as required in paragraph XI, the lease agreement terminated automatically as to the whole of the leased premises except as to each producing well and the 10-acre tract surrounding it. It appears, therefore, the lessee's right, title or interest in and to the oil and gas in place vested only as and when producing wells were drilled and completed and that such vesting was limited to the 10-acre tract surrounding each such well. The lessee was under no obligation to continue the development program provided for in the lease but he acquired rights under the lease only by the execution of such program. In the event of a termination of the lease by failure of the lessee to execute the drilling program he was relieved of all obligations thereunder except to continue the operation of the producing wells thereon. It appears obvious, therefore, that the consideration for such right, title or interest as the lessee acquired in the leased premises was the drilling and completion of producing oil wells. This being true it matters *338 not whether it be considered that the lessee's interest vested upon the execution of the lease agreement, subject to defeasance for nonperformance of conditions, or upon the completion of producing wells under the required drilling program, since in either even the drilling of the wells was the consideration for lessee's interest in the oil and gas in place. In United States v. Sentinel Oil Co., supra, the court said: Appellee's attempts to distinguish the State Consolidated case from the instant one, by the fact that in the former case title to the property was not to pass until after the property owner had received his $1,400 from the proceeds of the well, while in the instant case title passed upon the execution of the contract. We do not think that this distinction changes the situation. In both cases the drilling expenditures were the consideration for the passing of title to the land. A part of the burden of such consideration in this proceeding was, of course, the expenses incident and necessary to the drilling and equipment of such wells. Included in such expenses were the expenditures herein sought to be deducted. The entire *339 expense of such wells was, therefore, a capital expenditure and the provisions of the regulations hereinabove cited are not applicable. Accordingly, we hold that petitioners were not entitled to the deduction claimed and the action of the respondent in disallowing such deduction is approved. Decision will be entered for respondent. Footnotes
1. Sec. 19.23(m)-16. Charges to capital and to expense in the case of oil and gas wells. - (a) Items chargeable to capital or to expense at taxpayer's option: (1) Option with respect to intangible drilling and development costs in general: All expenditures for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas, may, at the option of the taxpayer, be deducted from gross income as an expense or charged to capital account. * * *↩